# THE STATE OF MINNESOTA,

*v.*

## GEORGE JOHNSON.

1.   In an indictment for polygamy, under *Sections 2 and 3, Ch. 96, Pub Stat.*, if it be averred that the prisoner "Knew at the time of said second marriage, and ever since, that his first and lawful wife was still living," it is not necessary to negative the *exceptions* made by the Statute of cases where " the husband or wife of the party charged shall have been continually remaining beyond sea, or shall have voluntarily withdrawn from the other, and remained absent for the space of seven years together."

2.   Neither is it necessary, when the second marriage is alleged to have taken place in the State of Wisconsin, to aver that such second marriage was "unlawful in the State of Wisconsin."

3.   To sustain a prosecution for polygamy under the Statute referred to, marriage *in fact*, must be proved, and by *direct evidence*. Indirect or circumstantial evidence, as of cohabitation, repute, conduct of the parties, birth of children, and admissions, is not competent to prove marriage in fact, nor to corroborate the direct evidence of marriage in fact.

4.   *Sec. 89, page 531, Gen. Stat.*, makes evidence of this indirect character admissible for the purpose of establishing the fact of marriage, and must, under the decisions of the Federal Supreme Court, be held to be *ex post facto* as to offences committed prior to the time when it went into effect, July 31st, 1866.

5.   The second wife was called by the State to prove the second marriage. She testified that she had not been married to the prisoner. *Held*, that she might properly be asked by the State, "Did you ever say to Mrs. Ketchum that you were married to Geo. Johnson, the prisoner, in the city of La Crosse?"

An indictment for the crime of polygamy was found against the defendant in the District Court for Winona county, under which he was tried, convicted and sentenced. The defendant

removes the cause to this court by writ of error. The case is fully stated in the opinion of the court.

BERRY & WATERMAN for Plaintiff in Error.

WM. COLVILL, Attorney General.

*By the Court*—BERRY, J. At the March Term, 1866, of the District Court for the County of Winona, an indictment was found against the plaintiff in error, in which he is accused of the crime of polygamy committed as follows: "That the said George Johnson, on the 18th day of March, A. D. 1835, at the city of Buffalo in the State of New York, did marry and take to wife one Eleanor Cherry ; that afterwards, to-wit: during the year 1856, the said George Johnson in the County of La Crosse, State of Wisconsin, while his lawful wife Eleanor was still living, did unlawfully marry and take to wife Catherine Flannegan, and the said George Johnson ever since the said last named marriage, has continued to reside and co-habit with the said Catherine Flannegan in the County of Winona, State of Minnesota ; that the said Eleanor Cherry, the former wife of the said George Johnson, is still living in the State of New York, and that the said George Johnson knew at the time of said second marriage, and ever since, that his first and lawful wife, the said Eleanor Cherry was still living, and that he the said George Johnson had never been divorced from the said Eleanor Cherry, and that the said George Johnson has wilfully, knowingly and feloniously, ever since said second marriage, continued to co-habit with the said Catherine Flannegan, in the County of Winona, State of Minnesota, contrary to the form of the statute in such case made and provided, and against the peace and dig-

nity of the State of Minnesota." Upon this indictment the accused was tried, convicted and sentenced, and he brings the cause into this court by writ of error.

The statute in force at the time this indictment was found, and relating to the crime of polygamy, reads as follows:

SECTION 2. "If any person who has a former husband or wife living, shall marry another person, or shall continue to co-habit with such second husband or wife, he or she shall, except in the cases mentioned in the third section, be deemed guilty of the crime of polygamy, and shall be punished," &c.

SEC. 3. "The provisions of the preceding section shall not extend to any person, whose husband or wife shall have been continually remaining beyond sea, or shall have voluntarily withdrawn from the other, and remained absent for the space of seven years together, the party marrying again, not knowing the other to be living within that time; nor to any person who has been legally divorced from the bonds of matrimony, and was not the guilty cause of such divorce." *Pub. Stat.*, *page* 728.

It will be observed that the indictment in this case does not allege that Eleanor Cherry, the first wife of the plaintiff in error, has not been continually remaining beyond sea. His counsel contends that the exception made where the wife has "been continually remaining beyond sea," is an exception contained in the same clause (of the act) which creates the offence, and that it is therefore necessary, under a rule of pleading, that the indictment should show affirmatively, that the exception does not exist in the case in which the indictment is found. It would seem proper to regard the exceptions as made in the same clause which creates and defines the offence of polygamy, to wit: section 2. For a more particular description of such exceptions, reference is made to section 3 immediately following.

This appears to have been the construction followed, in framing indictments for polygamy under the statute of Massachusetts (which is almost literally indentical with our own) in *Com. vs. Boyer*, 7 *Allen*, 306, and in *Com. vs. Johnson*, 10 *Allen*, 196. Without questioning this rule of pleading, or its applicability to this case, the Attorney General claims that the want of the allegation referred to, is cured by the subsequent allegation, " that the said George Johnson knew at the time of said second marriage, and ever since, that his first and lawful wife, the said Eleanor Cherry was still living." We think this position is sound. Under the statute to which we have referred, it has been held in Massachusetts, that the words " and remained absent for the space of seven years," apply " as well to the case of the wife remaining beyond sea, as to the case where one party has voluntarily withdrawn from the other." *Com. vs. Johnson*, 10 *Allen*, 198. See also *Com. vs. Mash*, 7 *Met.*, 472.

The same construction is to be put upon our statute, and it must follow that the other words, " the party marrying again not knowing the other to be living within that time," apply also to both cases. In this view of the statute, the fact that the first wife had continually remained beyond sea, would not bring the accused within the exception of the statute, so long as he knew that his first wife was in life, and the latter fact being alleged, it cannot be necessary to negative the former. 3 *Gr. Ev.*, *Sec.* 204.

It will not then be our duty in this case to define the phrase, "beyond sea." The authorities are not in harmony as to its meaning, some holding that it signifies " out of the State," and some " out of the United States." *Whitney vs. Goddard*, 20 *Pick.* 307; *Bank Alexandria vs. Dyer*, 14 *Peters* 145; *Rhodes vs. Bell*, 2 *How. U. S.* 405; *Murray's Lessee vs. Baker*, 3 *Wheaton*, 287; *Shelby vs. Guy*, 11 *Wheaton*, 368;

*Bouvier Dict., Title* "*Beyond Sea;*" 3 *Pars. Contracts,* 5*th Ed.*, 98; *Ang. on Lim. Sec.* 200.

It is further insisted by the counsel for the prisoner, that the indictment is bad because it does not allege that the second marriage was "unlawful in the State of Wisconsin where it took place." Whether it is to be presumed (as the Attorney General contends) that the law of Wisconsin is in this respect like our own, (*see however White vs. Knapp*, 47 *Barb. S. C. R.*, 554), we do not deem it necessary to determine. If the second marriage was celebrated in Wisconsin, the parties cannot be punished for it in this State. If it was a crime, it was an offence against the peace and dignity of another State. But as we understand the statute, even if the second marriage was lawful where celebrated, "continuing to co-habit with such second husband or wife," while the first is living, by the party marrying again, with knowledge that the first wife is living, is polygamy by our law. *See Com. vs. Bradley*, 2 *Cushing*, 554; *Regina vs. Cullen*, 9 *C. & P.* 681.

Neither *ex comitate*, nor on grounds of public policy, has it been considered that a State is bound to sanction incestuous or polygamous marriages, though valid in another State where they were entered into. *Bishop on Marriage and Divorce, Sec's* 127, 130, 149; *Story Conf. Laws, Sec.* 114; 2 *Gr. Ev., Sec.* 460, *page* 442, *note* 1; 2 *Kent*, 91, *note a*. The objections to the indictment must therefore be overruled.

A form of indictment for bigamy is prescribed in *Sec.* 67, *page* 759, *Pub. Stat.* : if that form be applicable and sufficient, it is manifest that the indictment in this case is good; but as our attention was not called to the statute by counsel, and no point is made upon it, and as we sustain the indictment on other grounds, we do not deem it necessary to examine the statute referred to.

In the progress of the trial, Moses Cherry was put upon the stand by the State, and testified "to having been an actual witness to the performance of the marriage ceremony," (between George Johnson the prisoner and Eleanor Cherry) "at the house of the witness, by a Methodist minister; that they stood up together, and minister performed the ceremony in the usual form, and pronounced them man and wife."

No objection was made to the competency of this testimony. The rule generally laid down is, that in a prosecution for polygamy, a first marriage *in fact* must be proved, and this may be done by the testimony of an eye witness to the marriage. 2 *Gr. Ev. Sec.* 461; 2 *Starkie Ev.* 698, 894; *Bishop on Mar. and Div. Sec.* 324; *Catherwood vs. Caslon* 13 *M. & W.* 264. As a marriage *in fact* must be made out, the question of marriage, or no marriage, is to be determined by the *lex loci contractus*: it is also held necessary that it should appear that the first marriage was valid by the law of the place of its celebration. 2 *Starkie Ev.* 894–5, 705; 3 *Gr. Evidence, Sec.* 204; *Lacon vs. Higgins*, 16 *E. C. L.* 425; *Catherwood vs. Caslon* 13 *M. & W.*, 264. As to this, however, no point is made in this case. The Court, against objection, received evidence of admissions of the accused as to the fact that Eleanor Cherry was his wife, also evidence of the co-habitation of the accused and Eleanor Cherry, evidence of the fact that they had three or four children, and evidence of general repute as to their relation of husband and wife. In *State vs. Armstrong*, 4 *Minn.*, 344, in delivering the opinion of the Court, Mr. Justice Flandrau says: "But in criminal prosecutions for bigamy, or in adultery where the offence depends upon the defendant being a married man, or woman, the marriage must be proved in fact, and a conviction cannot be had upon the admissions of the defendant," and cites *People vs. Humphrey*, 7 *Johns*, 314. Following the rule laid down by the authorities before cited,

and recognized in *State vs. Armstrong*, that a marriage *in fact* must be proven, and by direct evidence, the question now to be considered is, whether, in addition to this direct evidence, indirect or circumstantial evidence, as of co-habitation, repute, conduct of the parties, birth of children, and admissions, is admissible on the question of marriage, in prosecutions for bigamy.

On this point most of the authorities are not explicit, although generally agreeing that such evidence is not *sufficient*.

In *Gahagan vs. The People*, 1 *Parker Crim. R.*, 383, and in *Hayes vs. The People*, 25 *N. Y.*, 396, while evidence of co-habitation, confessions and conduct, is held to be insufficient to warrant a conviction for bigamy, it is considered to be admissible, as *corroborative* of the positive and direct evidence of an actual marriage.

We find no other cases in which this view is taken; while in *State vs. Roswell*, 6 *Conn.*, 446, Mr. Justice Daggett, speaking of proof of co-habitation, reputation and confessions, says: " I am satisfied that this testimony was from its nature inadmissible, because, if accompanied with proof of a marriage in fact, unnecessary, and if not so accompanied, as was the case here, then wholly insufficient." Direct and positive evidence of an *actual* marriage, a marriage *in fact* being indispensable, it is difficult to see what useful purpose could be subserved by indirect evidence not sufficient in itself. If the direct evidence does not establish the marriage, there is a want of indispensable proof, and this want cannot be supplied by indirect evidence in the way of corroboration, for that would be in effect a violation of the rule by which proof by direct evidence is required. We think the doctrine of the case cited from 6 *Conn.* is sound, and that evidence of this character should be excluded, so far as it is offered for the

purpose of establishing marriage; it would of course be admissible, so far as it tended to show co-habitation, for the purpose of proving that a party charged with polygamy under our statute continued to co-habit with the second husband or wife. *See Pub. Stat.*, 728, *Sec.* 2.

As to the second marriage, which is also required to be proved by direct evidence of a marriage in fact, the only testimony in the case consisted of evidence of reputation, cohabitation and the birth of children, together with what may perhaps be regarded as an admission, by silence.

This admission is found in the testimony of George Johnson, a son of the prisoner, who says: "I heard Catherine Flannagan tell defendant, she would not have married him, if she had known he had another wife. Father said mother would come out if she knew where he was and take all his property."

Under the rule as to proof of the first marriage, which we have before enunciated, and which applies also to the proof of the second marriage, (*see* 3 *Gr. Ev.*, *sec.* 205,) it is manifest that there was no direct evidence of a second marriage in fact, in this case. This was fatal to the prosecution, unless the statute upon which the State relies has changed the rules of evidence, and applies to this case. This statute took effect from and after the 31st day of July, 1866, after the indictment in this case was found, and reads as follows: "When the fact of marriage is required or offered to be proved before any court, evidence of the admission of such fact by the party against whom the proceeding is instituted, or of general repute, or of co-habitation as married persons, or any other circumstantial or presumptive evidence from which the fact may be inferred, shall be competent." *Sec.* 89, *page* 531, *Gen. Stat.*

We are of opinion that by the word "competent," the leg-

islature meant admissible for the purpose of establishing the fact of marriage; in other words such evidence as, if believed, would authorize a jury to find the fact of marriage. If our construction is correct, it follows that the rule as to what is competent evidence of a marriage in fact, so far as prosecutions for bigamy and adultery are concerned, has been changed by this legislation.

It is upon this provision of the statute that the Attorney General principally relies, in justification of the rulings of the court, by which indirect evidence was admitted to establish a marriage in fact. It is contended on behalf of the prisoner, that the statute before quoted is, so far as this case is concerned, (in which the indictment was found *before the passage* of such statute) *ex post facto*, and therefore obnoxious to the prohibition found in *Sec.* 10, *Art.* 1, *of the Federal Constitution*, and in *Sec.* 11, *of Art.* 1, of the Constitution of this State.

In *Fletcher vs. Peck*, 6 *Cranch* 138, an *ex post facto* law is defined by Ch. J. Marshall, to be " one which renders an act punishable in a manner in which it was not punishable when it was committed."

In *Watson vs. Mercer*, 8 *Peters*, 110, Judge Story speaks of *ex post facto* laws as " penal and criminal laws which punish a party for acts antecedently done, which were not punishable at all, or not punishable to the extent or in the manner prescribed."

In *Calder vs. Bull*, 3 *Dallas*, 386, which is perhaps the earliest case in which a construction was put upon the expression *ex post facto* by the Supreme Court of the United States, an *ex post facto* law is defined to be, 1st, " every law that makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action. * * * 4th. Every law that alters the legal rules of

evidence, and receives less or different testimony than the law required at the time of the commission of the offence, in order to convict the offender."

Speaking for myself alone, I am inclined to the opinion that it would not be difficult to deduce the. latter proposition from the first, or from the definitions found as above in *Fletcher vs. Peck, and Watson vs. Mercer.*

In the comparatively recent case of *Cummings vs. the State of Missouri,* 4 *Wallace,* 325, Mr. Justice Field, in delivering the majority opinion says: "By an *ex post facto* law is meant one which imposes a punishment for an act which was not punishable at the time it was committed, or imposes additional punishment to that then prescribed, or changes the rule of evidence by which less or different testimony is sufficient to convict than was required." In the dissenting opinion *ex parte Garland,* 4 *Wallace,* 390, which stated the grounds of the dissent in *Cummings vs. the State of Missouri,* also, Mr. Justice Miller, speaking of the doctrine announced in *Calder vs. Bull, supra,* says: "This exposition of the nature of *ex post facto* law has never been denied." These views of the Supreme Court of the United States upon a clause of the Federal Constitution, part of what Chief Justice Marshall, in *Fletcher vs. Peck,* terms " a bill of rights for the people of each State," are of course authoritative, and it is unnecessary to look elsewhere for a construction.

Prior to the passage of our statute of 1866, before cited, the law required marriages in fact to be proved by direct testimony, to warrant a conviction for polygamy.

By this statute it is manifest that this rule of evidence was changed so as to make "less or different testimony sufficient to convict than *was* required. "

So far as past offenses and indictments found before the act of 1866 took effect (as is the case here) are concerned, the act

of 1866 must, under the authorities cited, be held to be *ex post facto*, and therefore not applicable to the trial of this indictment.

For convenience, without following the order of the trial, it is proper here to advert to the charge of the Court.

Among other things the Court charged, "that the alleged second marriage might be proven by circumstantial evidence, the sufficiency of which was within the province of the jury to decide, and that a marriage in fact need not be proved by direct testimony, but that they must be satisfied from the evidence that a marriage in fact had taken place; that the jury must find from the evidence that the defendant had actually married Catharine Flannegan, when the defendant knew at the time of such marriage, he had a lawful wife living."

It is quite apparent that this charge proceeded upon the ground that the statute of 1866, before referred to, applied to this case.

Holding as we have, that it did not apply, it follows that the learned judge was in error, and that direct testimony to the second marriage in fact, was indispensable to sustain the prosecution.

Catherine Flannegan, the alleged second wife of the prisoner, was put upon the stand by the State, and after testifying in substance, that she was not married to the prisoner, was asked on her examination in chief the following question, "Did you ever say to Mrs. Ketchum while she was stopping in your house in 1865, that you were married to Geo. Johnson in the city of La Crosse?"

The question was objected to by the counsel for the accused "as being hearsay, and as improper for the purpose of impeaching the witness of the State." The objection was overruled and the witness answered, "I might have said so. I

supposed so long as I resided with him I might as well say we were married. "

There was no attempt to show by any other evidence, that the witness had made the statement alluded to in the question, in more positive terms than she admitted in her answer.

What it may be necessary to hold as to the right of a party to prove that a witness, whom he has called, and whose testimony is unfavorable to his cause, had previously stated the facts in a different manner, for the purpose of impeaching his testimony, we are not now called upon to determine. The question in this case was addressed to the witness herself, and no attempt was made to impeach her by showing that her answer was false. The time to make this objection (if at all) was when such attempt was made. In Mellhinch vs. Collier, 15 Ad. & Ell. (N. S.) 887, Patterson, J., says, "I think the learned Judge was right in allowing the questions which were put to the witness herself, though he could not have permitted her answer to be contradicted, if she had remembered her former statements and given evidence of them. There is a distinction between asking questions of a witness in the box, as to statements he may have formerly made, and calling other witnesses to say in contradiction to him that he made such statements. * * * "Here at all events, we think, that the objection to the questions came too soon, and the counsel was properly allowed to ask the witness Tremlett, whether she had not made different statements before. " It will be seen by examination, that the inquiry as to former statements made by the witness Tremlett, inconsistent with her testimony, was addressed to her on her direct examination by the party whose witness she was. In the same case Coleridge, J., agrees to the distinction drawn by Justice Patterson, and Erle, J., concurring, proceeds to say, "A plaintiff's witness says, in effect, that the plaintiff has no cause of

action. Then he is asked whether he has not formerly made a different statement. I think that question is proper, and not inconsistent with the rule that a party knowing a witness to be infamous, ought not to produce him, and must not be allowed to take the chance of his answers, and then bring evidence to contradict him. "

The objection that this question calls for *hearsay* evidence is manifestly untenable. The object is either to lead the witness to correct her testimony, or to save the party calling her from being sacrificed by his witness. The testimony is not substantive; it does not go to establish the issue on trial, and should not be received for that purpose. At the same time it is no more hearsay, in an objectionable sense, than it would be if brought out on a cross-examination.

Holding as we do that no evidence was competent upon the question of marriage, except direct evidence of a marriage *in fact*, it is unnecessary to consider the particular objections resting upon other grounds than *general incompetency*, which were made in the progress of the trial to the admissibility of different items of indirect testimony introduced to prove the second marriage.

The general rule which we lay down prohibits their use for that purpose.

We believe that this disposes of all the points made by the counsel for the plaintiff in error; and it follows that for divers reasons the judgment below must be reversed, and a new trial awarded.

McMILLAN, J.—The weight of authority seems to determine that positive evidence of a marriage is required in cases of this character, although I am unable to discover any ground for this position in the case of *Morris vs Miller*, 4 *Burr*, 2057, 2059, upon which the authorities rely for the origin of the

doctrine ; but from a limited examination I find no case except that of *The State of Connecticut vs. Roswell*, 6 *Conn. R.* 447, which directly lays down the position, that evidence of admissions, co-habitation, &c., are not competent to support the positive evidence of the marriage; in that case it does not appear that there was any positive evidence of the marriage, and the inference is, that there was none, and the question under consideration here was not involved in the case, and the force of the decision is impaired by the dissent of two members of the Court.

The authorities all agree that for the purpose of proving identity, such evidence is admissible.   Conceding that positive evidence of the marriage is required, when such evidence is produced, I can see no reason why it may not be corroborated, and strengthened, by any circumstances legitimately tending to that end.   " Confession and co-habitation, would be competent evidence alone of a marriage in most civil actions ; it is competent in all, but not sufficient in prosecutions for bigamy, actions for criminal conversation, and other cases in which a marriage in fact must be proved.   But in this, as in every other case, express evidence of a marriage in fact, may be strengthened and supported by that which tends to prove the same fact, or from which in other actions and proceedings the existence of the fact might be presumed. *Hayes vs. The People*, 25 *N. Y.* 396 ; *see also Gahagan vs. The People*, 1 *Parker Crim. R.* 386.   Upon this question, therefore, I regret to differ with my brethren, but I concur in the remaining questions considered in the opinion, and in the disposition of the case.